(C. D. 1543)

PHILIPP BROS., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 23, 1953)

*John D. Rode* for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*Richard H. Welsh,* special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation of lead ingots was assessed with duty at the rate of $1\frac{1}{16}$ cents per pound on the lead content, pursuant to the terms of paragraph 392 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 392), as modified by the trade agreement between the United States and the United Mexican States, 78 Treas. Dec. 190, T. D. 50797.

It is the contention of plaintiff that the commodity is entitled to entry free of duty in accordance with the provisions of Public Law 725 of the 80th Congress, approved June 19, 1948 (62 Stat., Part 1, p. 559) (83 Treas. Dec. 251, T. D. 51951).

The statutory provisions involved read as follows:

Paragraph 392, as modified, *supra:*

Lead bullion or base bullion, lead in pigs and bars, lead dross, reclaimed lead, scrap lead, antimonial lead, antimonial scrap lead, type metal, Babbitt metal, solder, all alloys or combinations of lead not specially provided for_____ $1\frac{1}{16}$¢ per lb. on the lead contained therein

Public Law 725 of the 80th Congress, *supra:*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the import duties imposed under paragraphs 391 and 392 of title I of the Tariff Act of 1930, as amended, on lead-bearing ores, flue dust, and mattes of all kinds, lead bullion or base bullion, lead in pigs and bars, lead dross, reclaimed lead, scrap lead, antimonial lead, and antimonial scrap lead shall not apply with respect to imports entered for consumption or withdrawn from warehouse for consumption during the period beginning with the day following the date of the enactment of this Act and ending with the close of June 30, 1949.

The question for our determination is whether the imported commodity was entered for consumption during the period beginning with the day following the date of the enactment of Public Law 725, *supra,* and ending *"with the close of June 30, 1949."* [Emphasis added.]

The case was submitted for decision upon the following documentary exhibits:

Exhibit 1, a communication attached to the protest entitled "Memorandum re Protest 7491/1949," dated November 3, 1949, signed by the collector of customs at New York.

Exhibit 2, a communication attached to the invoice and entry papers, under the letterhead of the Treasury Department, Bureau of Customs, New York, dated June 30, 1949, 5:25 p. m., entitled "MEMORANDUM of telephonic instructions from Mr. Higman, Assistant Deputy Commissioner, Bureau of Customs, Washington. Re: Entry of 90,649 lead Ingots ex the SS TPOUSKO [*sic*] from Yugoslavia," signed by Hildur Sandberg.

Exhibit 3, a communication attached to the invoice and entry papers, entitled "Memorandum for Mr. F. B. Laughlin, Assistant Collector," dated July 1, 1949, from L. V. Smith, deputy collector.

For convenient reference, the foregoing exhibits are set out in full.

[EXHIBIT 1]

November 3, 1949.

Memorandum re Protest 7491/1949.

Lead in ingots, bullion, pigs or bars, was assessed with duty at $1\frac{5}{16}$¢ per pound on the lead content thereof under paragraph 392 of the Tariff Act of 1930 and T. D. 50797.

Free entry is claimed under T. D. 51951 on the theory that the lead was entered prior to the *close* of June 30, 1949 after which date T. D. 51951 was no longer effective.

T. D. 51951 (Public Law No. 725, 80th Congress) approved June 19, 1948, reads as follows:

"Be it enacted by the Senate * * * That the import duties imposed under paragraphs 391 and 392 of title I of the Tariff Act of 1930, as amended, on lead-bearing ores, flue dust, and mattes of all kinds, lead bullion or base bullion, lead in pigs and bars, lead dross, * * * shall not apply with respect to imports entered for consumption or withdrawn from warehouse for consumption during the period beginning with the day following the date of the enactment of this act and ending with the close of June 30, 1949."

The facts briefly are as follows:

The M. S. Topusko, transporting the lead in issue, reached Ambrose Lightship within the boundaries of the port of New York on June 30, 1949 at 10:05 P. M., Daylight Saving Time. A consumption entry for the importation was presented at the Custom House on June 30, 1949 at 10:15 P. M., Daylight Saving Time, to Mr. L. V. Smith, Deputy Collector in charge of the Entry Division, by Mr. John Enfield, representing T. B. Smith, customs brokers for Philipp Bros. Inc., the importer. Mr. Smith took the entry and informed Mr. Enfield that the so-called entry was not being accepted as of the time of presentation (June 30, 1949, 10:15 P. M., Daylight Saving Time), but was only being received at that time.

The consumption entry was subsequently numbered 704356 and dated July 18, 1949 when estimated duty was paid. The entry was liquidated on August 25, 1949 and this protest was fimely [*sic*] filed.

It is the Collector's opinion that the phrase "close of June 30" as used in T. D. 51951 means "close of official hours for doing business." Since the M. S. Topusko

reached the port of New York on June 30, 1949 after the close of the official hours of business, the lead could not be entered and was not entered prior to the *close* of June 30, 1949. (Note sections 1.8 and 8.4 of the Customs Regulations of 1943.)

Hence the importation was not entitled to free entry under T. D. 51951 and therefore was correctly classified for duty under paragraph 392 of the Tariff Act of 1930 as amended.

> HARRY M. DURNING, Collector.
> [S] B. Fogelman
> Per: B. Fogelman
> Protest Reviewer.

[EXHIBIT 2]

[Seal]

## TREASURY DEPARTMENT
## BUREAU OF CUSTOMS
### NEW YORK 4, N. Y.

OFFICE OF THE COLLECTOR
DISTRICT NO. 10

IN REPLY REFER TO:
704356

ADDRESS ALL COMMUNICATIONS
FOR THIS OFFICE
TO THE COLLECTOR OF CUSTOMS
NEW YORK 4, N. Y.

June 30, 1949.
5:25 p. m.

MEMORANDUM of telephonic instructions from Mr. Higman, Assistant Deputy Commissioner, Bureau of Customs, Washington.

Re: Entry of 90,649 lead Ingots ex the SS TPOUSKO [*sic*] from Yugoslavia.

It has been decided—have someone stand by to receive these papers after the merchandise is within the port limits. Make whatever local arrangement is necessary to ascertain when within the port limits. If the vessel arrives after midnight, Eastern Standard Time (1:00 a. m. Daylight Saving Time) we cannot accept them, but up to midnight EST have someone stand by to do so.

Note on the papers the date, hour and minute of receipt.

Announce to whoever presents the papers that the entry is not being accepted as of the time of presentation but is simply being received and whether it will be accepted as of that time will depend upon decision subsequently to be made in Washington.

Stress that we are not accepting the entry but simply receiving the papers and await a decision from the Bureau as to whether the entry may be accepted.

Confirmed by Mr. Laughlin standing beside Mr. Higman.

> [S] Hildur Sandberg
> Hildur Sandberg,
> Adm. Asst.

[EXHIBIT 3]

> July 1, 1949.
> LVS/hw-2
> 704356

Memorandum for Mr. F. B. Laughlin, Assistant Collector.

Regarding telephone instructions from Mr. Higman of the Bureau in connection with the entry of 90,649 lead ingots arriving ex S/S TOPUSKO at 10.05 P. M. Daylight Savings Time at Ambrose Lightship which is in the boundaries of the Port of New York. The merchandise was consigned to Philipp Bros. Inc.,

70 Pine St., New York, N. Y., and the writer stayed after hours and carried out instructions.

All entry papers were received and statement made at 10.15 P. M. Daylight Savings Time June 30, 1949. Mr. John Enfield, representing T. B. Smith, customs brokers for Philipp Bros. Inc., was advised that the entry is not being accepted as of the time of presentation but is simply being received and whether it will be accepted as of that time will have to be decided by the Bureau of Customs. *It was stressed that we are not accepting the entry but simply receiving the papers* and that we were awaiting the decision from the Bureau as to whether the entry may be accepted.

Further instructions are requested as to whether this entry should be fully processed as to numbering, ordering and signing of the permit as of June 30, 1949.

L. V. Smith<br>Deputy Collector.

[The following handwritten notation appears in left-hand lower corner of exhibit.]
Awaiting instructions from Bureau
No instructions yet.
 7/1/49

An examination of exhibits 1, 2, and 3, upon which the case was submitted, discloses the following salient facts which are not disputed:

(1) The merchandise in controversy, consisting of lead in ingots, bullion, pigs, or bars, arrived on the M. S. Topusko at 10:05 p. m. daylight saving time at Ambrose Lightship, which was within the boundaries of the port of New York, on June 30, 1949.

(2) The merchandise was consigned to Philipp Bros., Inc., plaintiff herein.

(3) A consumption entry for the importation was presented at the customhouse on June 30, 1949, at 10:15 p. m. daylight saving time to *L. V. Smith*, deputy collector in charge of the entry division, by John Enfield, representing *T. B. Smith*, customs broker for Philipp Bros., Inc.

(4) Mr. L. V. Smith "received" the entry but informed Mr. Enfield that the "so-called entry" was not being accepted at the time of presentation (June 30, 1949, 10:15 p. m. daylight saving time).

(5) The consumption entry was subsequently numbered 704356 and dated July 18, 1949, when estimated duty was paid.

(6) The entry was liquidated on August 25, 1949, and the protest now before us was duly filed.

The following statement by the collector of customs is set forth in exhibit 1:

It is the Collector's opinion that the phrase "close of June 30" as used in T. D. 51951 [Public Law 725, *supra*] means "close of official hours for doing business." Since the M. S. Topusko reached the port of New York on June 30, 1949 after the close of the official hours of business the lead could not be entered and was not entered prior to the *close* of June 30, 1949. (Note sections 1.8 and 8.4 of the Customs Regulations of 1943.)

Hence the importation was not entitled to free entry under T. D. 51951 and therefore was correctly classified for duty under paragraph 392 of the Tariff Act of 1930 as amended.

Upon this phase of the case it is significant, as disclosed in exhibit 2, that at 5:25 p. m. on June 30, 1949, an administrative assistant at the customhouse made a memorandum of telephonic instructions from Mr. Higman, Assistant Deputy Commissioner, Bureau of Customs, Washington, D. C., that with respect to the entry of 90,649 lead ingots "ex the SS Tpousko [*sic*] from Yugoslavia"—

It has been decided—have someone stand by to receive these papers after the merchandise is within the port limits. * * * If the vessel arrives after midnight, Eastern Standard Time (1:00 a. m. Daylight Saving Time) we cannot accept them, *but up to midnight EST have someone stand by to do so.* [Italics supplied.]

Exhibit 2 contains the further statement:

Stress that we are not accepting the entry but simply receiving the papers and await a decision from the Bureau as to whether the entry may be accepted.

As stated by defendant in its brief, "If the lead in question was entered on June 30, 1949, it would be free of duty; but if entered after that date, it would be dutiable as assessed."

Consequently, the real question for determination here narrows down to this—Did the tender of a consumption entry by plaintiff and its receipt (even though not accepted) by Deputy Collector Smith at the customhouse on June 30, 1949, at 10:15 p. m. daylight saving time—it being admitted that the vessel conveying the merchandise in dispute had arrived within the limits of the port of New York at 10:05 p. m. daylight saving time—constitute an entry for consumption before "the close of June 30, 1949"? We are of the opinion for reasons which will appear *infra* that, when all the facts and circumstances of the case are considered, plaintiff is entitled to the relief granted by the terms of Public Law 725, *supra*.

Defendant in its brief invites our attention to the cases of *F. J. Benkart & Co., Inc.* v. *United States,* 2 Cust. Ct. 466, C. D. 177, and *F. B. Wilcon* v. *United States,* 13 Cust. Ct. 96, C. D. 876, which, it is claimed, support the collector's decision.

Both of those cases related to the entry of *dutiable* merchandise, and the reasons asserted for denying the claims of plaintiffs were that the filing of consumption entries and the payment of duties were not completed within the time granted by law. In the case at bar, if the merchandise was entered for consumption before "the close of June 30, 1949," it was exempt from duty and, hence, the entry would be complete.

Defendant also cites *J. P. Navailles* v. *United States,* 1 Cust. Ct. 17, C. D. 5; *William J. Oberle, Inc.* v. *United States,* 4 Cust. Ct. 319, C. D. 351; *Tassini & Salisch-Parver, Inc.* v. *United States,* 6 Cust. Ct. 571, Abstract 45512 (and cases cited therein); and *John A. Conkey & Co.* v.

*United States,* 11 Cust. Ct. 217, Abstract 48554. All of these cases relate to dutiable merchandise and present circumstances and considerations which differentiate them from the facts in the case before us.

Defendant also stresses the point that certain customs regulations operate to defeat plaintiff's claim for free entry. Reference is made to section 1.8 of the Customs Regulations of 1943 which provides that—

(a) Except as hereinafter specified, each customs office shall be open for the transaction of general customs business between the hours of 8:30 a. m. and 5 p. m. on all days of the year except Saturdays, Sundays, and national holidays.

Authorities cited hold said regulation to be a reasonable and valid authorization. However, the validity of that regulation is not in issue here. Upon this point, however, defendant cites *Gallagher* v. *United States,* 1 Ct. Cust. Appls. 69, T. D. 31034, a case where a withdrawal entry was brought into the customhouse at 5:30 p. m. and tendered to a deputy collector who was in his office. He refused to accept the entry since the cashier, ordinarily the proper person to receive the money to pay for the duties, was not in the customhouse, and there were but a few of the entry clerks still there. The regulations then in effect provided that the customs offices should be kept open for business between the hours of 9 a. m. and 4:30 p. m. on all days except Sundays and certain holidays. It was held that the hours fixed were reasonable and that the importer had no complaint against the collector for refusing tender of the entry at 5:30 p. m. unless the customhouse was actually open for business when the tender was made and refused. In its opinion, the court said—

Upon the first point, however, the evidence is that when Mr. Gallagher went into the customhouse the cashier and most of the entry clerks had gone, and that the office was not open for the general transaction of business, and that it was not meant that it should be. The mere fact that Mr. Gallagher could enter, and that there was a deputy collector and several clerks in the office when he went in, signifies very little. For all that appears the door may have been left open for temporary convenience, and the few officials there may have remained to close up the business of the day, or may have tarried for their mere personal accommodation.

Defendant asserts that "there is no evidence in the record which in any way tends to prove that at the time the entry was presented the customshouse was open for the transaction of general customs business. As has been heretofore shown, Mr. Smith, the Deputy Collector, clearly and unequivocally informed the broker's agent that the entry was *not* being accepted as of the time of presentation but was *only being received.*" [Italics quoted.]

Whether or not the customhouse was open on the night of June 30, 1949, at 10:15 p. m. for the transaction of "general customs business," suffice it to say it is crystal clear from the record before us that the

customhouse was designedly kept open until that hour, and a deputy collector of customs was delegated upon instructions from the Bureau of Customs in Washington to "stand by to receive these papers [entry] after the merchandise is within the port limits," and to "Make whatever local arrangement is necessary to ascertain when within the port limits." These were telephonic instructions from an Assistant Deputy Commissioner at the Bureau of Customs in Washington to the office of the collector of customs in New York, as disclosed by exhibit 2, *supra*. The telephonic instructions further assert that "If the vessel arrives after midnight, Eastern Standard Time (1:00 a. m. Daylight Saving Time) we cannot accept them, but up to midnight EST have someone stand by to do so." It further appears from said exhibit 2 that the collector's office was instructed to "Stress that we are not accepting the entry but simply receiving the papers and await a decision from the Bureau as to whether the entry may be accepted."

While the Bureau of Customs in Washington and the collector of customs at the port of New York had a right to rely upon the cited regulations to close the New York customs office at 5 p. m. on the date in question, they chose to relinquish that right by designating an official to be present and to receive the entry in question. We construe these acts as constituting a waiver of the regulations by the customs officials.

It is manifest from the foregoing that the Bureau of Customs of the Treasury Department and the collector of customs at the port of New York deliberately intended to keep the customhouse open on the night of June 30, 1949, until midnight, eastern standard time, and to accept the entry of the importation of lead involved in these proceedings, provided the cargo arrived within the limits of the port and an entry was tendered prior to that time. All of these conditions were fulfilled, and it would have been an idle gesture to make all of these preparations and then to deny relief to the plaintiff. The ultimate decision of the collector of customs may well have resulted from a sense of uncertainty as to the legal implications involved, and he resolved the doubt in favor of the Government, leaving the importer to its remedy by protest to secure a judicial review. It is not believed that the collector intended arbitrarily to disavow the planned effort to offer the importer an opportunity to secure the advantage of free entry, if possible, pursuant to a law which expired at the close of June 30, 1949. The doubt which arose at the time entry was tendered on the night of June 30, 1949, should in our opinion be resolved in favor of the importer.

The language of the final words of Public Law 725, *supra*, "ending with the close of June 30, 1949" is unusual and is susceptible to two meanings—(1) close of business on June 30, 1949, or (2) close of the day of June 30, 1949 (which would be midnight of that day).

It may be noted that Webster's New International Dictionary, Second Edition, page 506, defines the word "close" as follows:

**close,** *n.* \* \* \* **1.** Conclusion; cessation; ending; end. \* \* \*

As stated in the brief of plaintiff—

June 30, 1949 is the name or title of a certain day, and a day is clearly the space of time which elapses \* \* \* between two successive midnights.

Citing Webster's New International Dictionary, Bouvier's Law Dictionary (3d Rev.) 757, 2 Blackstone Comm. 141.

Numerous other authorities and cases are cited in plaintiff's brief which, in view of our conclusion, we find unnecessary to review here.

The instructions contained in exhibit 2, *supra*, were apparently predicated upon the view expressed in the second alternative above set forth (*close of the day* of June 30, 1949), which we uphold as being in the spirit and intent of said Public Law 725. We are, therefore, of the opinion that the entry was timely filed.

For the reasons expressed herein, the protest claiming that the subject merchandise is entitled to free entry as provided by Public Law 725, *supra*, is sustained, and judgment will be entered accordingly.